[Cite as *In re B.T.*, 2023-Ohio-2082.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | |
|---|---|
| IN THE MATTER OF: B.T. & D.T. | : |
| | : |
| | :    C.A. No. 2022-CA-86 |
| | : |
| | :    Trial Court Case Nos. 20210430; |
| | :    20210431 |
| | : |
| | :    (Appeal from Common Pleas Court- |
| | :    Juvenile Division) |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on June 23, 2023

. . . . . . . . . . .

ROBERT ALAN BRENNER, Attorney for Appellant, Mother

ANDREW P. PICKERING, Attorney for Appellee, Clark County Department of Job and Family Services

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Mother appeals from two judgments of the Clark County Court of Common Pleas, Juvenile Division, which terminated her parental rights and granted permanent custody of her son, B.T., and daughter, D.T., to the Clark County Department of Job and Family Services ("CCDJFS"). For the reasons outlined below, the trial court's judgments

granting CCDJFS permanent custody of B.T. and D.T. will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} Mother and Father are the biological parents of five-year-old B.T. and three-year-old D.T. Mother also has two other children with a different father, thirteen-year-old A.B. and ten-year-old C.B. Prior to 2021, all four children resided with Mother at her home in Springfield, Ohio.

{¶ 3} On August 25, 2021, CCDJFS filed a dependency complaint pertaining to B.T. and D.T. In the complaint, CCDJFS alleged that it became involved with Mother in early 2021 due to referrals concerning the condition of Mother's home, truancy issues pertaining to A.B. and C.B., and Mother's drug use and mental health. Specifically, CCDJFS alleged that in March 2021, Mother's home smelled of marijuana and was ridden with trash, dirt, and cockroaches. CCDJFS also alleged that Mother had been arrested and jailed on truancy charges and had tested positive for tetrahydrocannabinol[1] ("THC") in April 2021. CCDJFS further alleged that Mother had had a prior children services case in 2017, due to substantiated physical abuse, neglect, and emotional maltreatment.

{¶ 4} Prior to the filing of the dependency complaint, B.T. and D.T. were briefly placed with their maternal grandmother as part of a safety plan. However, the children were removed from maternal grandmother's care after maternal grandmother submitted to a drug screen and tested positive for THC, oxycodone, and cocaine. B.T. and D.T.

---

[1]Tetrahydrocannabinol is the main psychoactive compound found in marijuana. *State v. Reeder*, 3d Dist. Allen Nos. 1-21-08, 1-21-09, 1-21-10, 2021-Ohio-4558, ¶ 32; *State v. Graves*, 5th Dist. Ashland No. 22 COA 001, 2022-Ohio-4130, ¶ 5.

were then placed with the O Family, who were family friends of Father. The O Family cared for B.T. and D.T. for approximately five months before they requested to have the children removed from their home due to the family's negative interactions with Mother. As a result of this request, CCDJFS filed motions requesting interim temporary custody of B.T. and D.T., which the trial court granted on September 17, 2021. Three months later, the trial court adjudicated B.T. and D.T. dependent children on December 2, 2021.

{¶ 5} In August 2021, Father signed a case plan participation waiver stating that he did not want to work on a case plan to reunify with B.T. and D.T. Mother, on the other hand, attempted to work on a case plan to reunify with her children. Approximately a year after Mother's case plan went into effect, CCDJFS filed motions on July 26, 2022, requesting that it be granted permanent custody of B.T. and D.T. on grounds that Mother had not made substantial progress on her case plan.

{¶ 6} On October 17, November 16, and November 18, 2022, the trial court held evidentiary hearings on the permanent custody motions pertaining to B.T. and D.T. In support of those motions, CCDJFS presented testimony from the assigned caseworker, Sierra Errett; Parenting Network Coordinator Jordan Rose; Family Court Treatment Coordinator Traci Schwartz-Sullivan; and the children's guardian ad litem ("GAL"), Amanda Lantz. Mother presented testimony from her drug and alcohol counselor, Veronica Bellamy, and also testified on her own behalf. The following is a summary of the testimony that was presented at the evidentiary hearings.

*Sierra Errett*

**{¶ 7}** Sierra Errett was the CCDJFS caseworker assigned to Mother's case. Beginning in May 2021, Errett worked with Mother and Father on developing a case plan to reunify with B.T. and D.T. Errett confirmed that, in August 2021, Father signed a waiver indicating that he did not want to work on a case plan and that he had not visited the children since that time. Mother, on the other hand, attempted to work on a case plan that included the following objectives:

- complete a drug and alcohol assessment and follow through with recommendations;

- complete a mental health assessment and follow through with recommendations;

- submit to random drug screens;

- obtain independent, safe, stable, and clean housing with working utilities;

- obtain employment to meet the financial needs of her family;

- engage in visitation and meet the needs of her children during visitation;

- engage in drug screens through juvenile court and follow through with all recommendations of juvenile court;

- engage in a parenting program and follow through with recommendations;

- meet with the caseworker monthly and communicate with the caseworker weekly; and

- sign all releases of information.

{¶ 8} Errett testified that, in an effort to assist Mother with completing these objectives, CCDJFS referred Mother to multiple counseling agencies and provided Mother with information on housing that was offered through a program called Project Woman. Since Mother did not have a valid driver's license, CCDJFS also provided Mother with a transportation referral through Rides Plus so that Mother could visit her children. In addition, Errett testified that CCDJFS conducted AQUIRANT searches for relatives and made referrals for home studies on relatives that Mother had suggested as possible placements.

{¶ 9} During her testimony, Errett confirmed that B.T. and D.T. had initially been placed with their maternal grandmother until maternal grandmother tested positive for THC, oxycodone, and cocaine. Errett also confirmed that B.T. and D.T. were thereafter placed with the O Family until they asked to have the children removed from their care due to negative interactions with Mother. According to Errett, the O Family was tired of Mother's harassing them and pressuring them to violate court orders.

{¶ 10} Errett testified that Mother provided her maternal aunt and sister-in-law as possible placement options. Errett testified that CCDJFS began a home study on the maternal aunt, but it placed the study on hold after determining that maternal aunt's residence did not have any beds for the children and due to concerns about certain individuals who stayed at her residence. Specifically, CCDJFS was concerned about Mother's uncle, who was a registered sex offender, and maternal grandmother, who was a known drug user. In addition, CCDJFS was concerned that the maternal aunt would

be susceptible to Mother's pressuring her to violate court orders.

{¶ 11} Errett testified that Mother's sister-in-law initially showed interest in taking custody of the children but ultimately declined to be a placement option when she learned of the need to submit to a home study. Errett also reached out to a second sister-in-law who similarly declined to be a placement option when it came time to schedule a home study.

{¶ 12} With regard to Mother's case plan objectives, Errett testified that Mother had obtained a drug and alcohol assessment and had been engaging in drug and alcohol counseling at a treatment center called CleanSlate. Errett also testified that Mother had been engaging in parenting classes through the Parenting Network. In addition, Errett confirmed that Mother had signed all releases for information.

{¶ 13} Errett's testimony also indicated that Mother had been engaging in drug screens through three different programs, i.e., CCDJFS, Clark County Juvenile Court, and CleanSlate. However, according to Errett, the drug screen results established that Mother had consistently tested positive for THC and suboxone and, on one occasion, cocaine. Errett testified that Mother did not always provide accurate, up-to-date prescriptions for her suboxone use and never presented a medical marijuana card. Errett also testified that Mother had occasionally declined to participate in drug screens, which counted as an automatic positive result. In addition, Errett testified regarding an incident in which Mother had attempted to alter a drug screen by purposely chewing up the mouth swab and dropping it on the ground. Errett further testified that Mother would often show up to screens smelling heavily of mouthwash, which was known to alter the

screen.

**{¶ 14}** Continuing, Errett testified that Mother had completed a mental health assessment but had not followed through with referrals for mental health counseling. Errett indicated that this was one of the most important components of Mother's case plan. Errett also testified that Mother did not consistently communicate with her and failed to meet with her once a month as required by the case plan. Errett explained that it was her practice to give Mother three meeting dates to choose from each month and that Mother would often not attend any of the dates offered. Errett asserted that Mother would make excuses not to attend office visits and would be highly emotional and hesitant to provide information when she did visit. In addition, Errett testified that Mother was not employed at the time of the hearing and that Mother's previous employment consisted of various jobs that Mother had maintained for only a short period of time.

**{¶ 15}** As for the visitation objective, Errett testified that Mother visited all four of her children once a week for three hours at CCDJFS's visitation center. Errett testified that there were concerns with Mother's visitation because she often showed up late to visits. Errett explained that showing up late was a concern because the children used the Rides Plus transportation service to get to the visitation center. According to Errett, the Rides Plus driver cannot wait for Mother to arrive because the driver has other visits to transport. Errett also testified that Mother had missed three visits without calling and that the missed visits resulted in Mother's visitation being put on hold for a period of time. Errett testified that Mother used lack of transportation as an excuse for missing the visits even though CCDJFS provided her with a Rides Plus referral.

{¶ 16} Errett also testified that Mother had not fulfilled the objective to obtain safe, stable housing. Errett testified that the cleanliness of Mother's home was no longer a concern, but she explained that the home was not a safe location due to its being the target of multiple shootings. Errett testified that Mother had reported concerns about the safety of her residence and had expressed her belief that the shootings were the result of Father's using drugs and owing people money.

{¶ 17} Errett testified that one of the shooting incidents took place while Mother and Father had unauthorized visitation with B.T. and D.T. Errett testified that the O Family had reported the shooting to her and told her that it had occurred after they had permitted Mother and Father to drive the children to Mother's home following a visit at a local entertainment center. The O Family told Errett that they were traveling behind Mother and Father's vehicle when they observed shots fired at the vehicle as it pulled into Mother's residence. According to Errett, the residence was considered so dangerous that the juvenile court had ordered her and the other individuals working on the case not to visit the home. Errett testified that Mother had recently reported that she was going to move to an apartment, but she did not yet have a lease and was still at the same residence.

{¶ 18} In addition to the case plan objectives, Errett testified regarding concerns about Mother's being in the presence of Father despite prior incidents of domestic violence between them and despite Mother's obtaining a protection order against Father. Errett testified that Mother and Father's unhealthy relationship posed a risk to the children because the children were not old enough to protect themselves if a physical altercation

were to transpire between Mother and Father.

{¶ 19} In summary, Errett testified that Mother had not made substantial progress on her case plan and would not be in a place to reunify with her children even if she were given more time to work on her case plan objectives. Errett indicated that the children were in a foster-to-adopt placement at that time, where they were doing well and had all their needs met. Errett testified that the children had been in their current foster home for over one year and were bonded to their foster mother. It was Errett's opinion that the best interest of the children would be served by granting permanent custody to CCDJFS.

*Jordan Rose*

{¶ 20} Jordan Rose was a coordinator at the Family & Youth Initiatives Parent Network, a free program that Mother had been using for parenting classes. Rose confirmed that Mother had been a client of the Parenting Network since June 8, 2021, and had last attended a parenting class on October 4, 2022. Rose indicated that Mother had completed "a decent amount" of parenting classes but declined to describe the number of classes completed as being "substantial." Tr. (Nov. 16, 2022), p. 237. Specifically, Rose testified that Mother had attended 18 out of 34 possible classes. Rose also testified that there had been a period of three months in which Mother did not attend class at all. Rose also indicated that there were two occasions when Mother showed up to class but failed to complete her homework. Although Rose testified that Mother had grown as a parent and was fit to parent her children, Rose admitted that she had never observed Mother with her children and that her opinion of Mother's parenting was based

solely off of her classwork.

### Traci Schwartz-Sullivan

{¶ 21} Traci Schwartz-Sullivan was the Family Treatment Court Coordinator who monitored Mother's participation in the juvenile court's random drug screening program. Sullivan testified that the court magistrate ordered Mother to sign up for the drug screenings and that Mother began the screenings on March 1, 2022. Sullivan testified, however, that Mother had been inconsistent in calling every day to see if she had been selected to be screened and that Mother had missed 32 screens over a period of 270 days. Sullivan also presented documentation showing that when Mother had been screened, she had consistently tested positive for THC and suboxone (buprenorphine), and occasionally for alcohol as well. *See* State's Exhibit 2.

### Amanda Lantz

{¶ 22} The testimony of Amanda Lantz, the children's appointed GAL, supported Errett's testimony regarding Mother's lack of communication and failure to complete her case plan objectives. Like Errett, it was Lantz's opinion that Mother had not made substantial progress on her case plan and that Mother would not be able to substantially complete her case plan within six months. Lantz also testified that she believed Mother had unresolved mental health issues. Lantz testified that because Mother had not completed her mental health objective, it was not in the children's best interest to be placed with Mother. Lantz also testified that "trouble seems to follow [Mother]" and that

the children would not be safe in Mother's care regardless of where she lived. Tr. (Nov. 18, 2022), p. 476. Furthermore, in her reports, Lantz indicated that Mother was manipulative and uncooperative.

{¶ 23} As for the children, Lantz testified that B.T. and D.T. were doing "fantastic" with their current foster mother and were thriving in her care. *Id.* at 471. Lantz also testified that the foster mother was open to adopting B.T. and D.T. and would follow court orders to keep certain individuals away from the children. In addition, Lantz testified that the foster mother facilitated visits with B.T. and D.T.'s half siblings and planned to maintain communication between them. Lantz further testified that foster mother had custody of her own grandson and that there were no concerns with B.T. and D.T.'s interactions with the grandson.

*Veronica Bellamy*

{¶ 24} Veronica Bellamy, a clinical counselor at an addiction treatment center in Springfield, Ohio, known as CleanSlate, testified that she had provided Mother with drug and alcohol addiction counseling at CleanSlate since June 13, 2022. According to Bellamy, Mother's history of drug use included abusing opiates such as percocet and oxycodone. Bellamy also testified that Mother had admitted to purchasing suboxone off the street. According to Bellamy, the physicians at CleanSlate prescribe Mother suboxone once a week for purposes of curbing her withdrawals and cravings. Bellamy testified that Mother was screened for drugs during every visit at CleanSlate and that Mother had tested positive for THC during every screen. Bellamy noted, however, that

Mother's THC levels had been consistently dropping and that, but for the THC use, Mother had made progress with maintaining her sobriety.

{¶ 25} On cross-examination, Bellamy confirmed that she did not provide mental health counseling and claimed that she was unaware that the physicians at CleanSlate had made a referral for Mother to receive mental health counseling. Bellamy had also been unaware that mental health counseling was a component of Mother's case plan.

*Mother*

{¶ 26} Mother testified that on November 5, 2022 (approximately two weeks before her testimony), she had moved out of the residence that had been the target of multiple shootings. Mother testified that she had obtained a two-bedroom apartment "on Friday or Saturday" but was then living at a friend's house while she and the landlord worked on improvements to the apartment. Tr. (Nov. 16, 2022), p. 274-275. Mother testified that she had not yet signed a lease for the apartment but had paid a $575 deposit. Mother testified that she did not know when the apartment would be finished and did not know whether the apartment was safe.

{¶ 27} Mother also testified that she had been engaged in drug and alcohol counseling at CleanSlate. Mother presented a September 26, 2022 letter from her CleanSlate counselor, Bellamy, stating that Mother had been a patient at CleanSlate since April 13, 2021. The letter also indicated that, as of September 26, 2022, Mother had attended all of her scheduled appointments at CleanSlate and had tested negative for opioids during the center's drug screens. *See* Mother's Exhibit E.

**{¶ 28}** Continuing, Mother testified that CleanSlate had referred her to PATH Integrated Health ("PATH") for mental health services. In support of this testimony, Mother presented a June 7, 2021 letter written by a CleanSlate physician's assistant stating that Mother would be attending counseling at PATH. *See* Mother's Exhibit G. Mother claimed that she had received a mental health assessment at PATH and had engaged in mental health counseling there for "close to one year" until her counselor left. Tr. (Nov. 16, 2022), p. 254. Mother claimed that she then signed up for counseling at CleanSlate, which she thought qualified as mental health counseling. Mother testified that it was not until October 2022 that she learned CleanSlate was not accredited to provide mental health services.

**{¶ 29}** Mother also confirmed that she was not then employed. Mother claimed that she previously had worked at ORBIS, Target Distribution, and Certified Oil. Mother testified that she had worked at ORBIS for three months in 2022, but she could not recall when and how long she had worked at Target Distribution and Certified Oil. During her testimony, Mother could not recall several other dates and events and attributed her memory loss to early onset Alzheimer's disease, a condition that she never reported to CCDJFS.

**{¶ 30}** Mother also testified that she had only missed a few drug screens and claimed that her caseworker had lied about her intentionally trying to alter some of the screens. Mother did, however, admit that she had a history of maintaining negative drug screens while still using drugs. Specifically, Mother testified that she had been able to graduate from a treatment program at McKinley Hall while still using drugs because she

"worked the program," which only screened once a week.   Tr. (Nov. 16, 2022), p. 289.

{¶ 31} Mother also admitted to consistently testing positive for THC and suboxone. Mother testified that she used marijuana every day and did not have a medical marijuana card.   But Mother claimed that she had been approved for a medical marijuana card just two days before giving her testimony.   Mother also suggested that her one positive test result for cocaine had been a false positive.

{¶ 32} Mother further admitted to missing parenting classes at the Parenting Network but claimed that she was making up the missed material.   Mother also testified that she did not have a valid driver's license but admitted to driving herself to court on the day of her testimony.   When asked how Mother would transport B.T. to his speech therapy if the children were placed back in her care, Mother testified that she would rely on maternal grandmother, a known drug user.   Mother also claimed that she was not in a relationship with Father and noted that her protection order was still in place.

{¶ 33} Mother testified that she generally did not meet with her caseworker on a monthly basis and expressed her belief that the caseworker had not been helping her. Mother, however, later testified that her caseworker had tried to help her find housing and made referrals and gave her phone numbers to call for mental health services.   Mother also claimed that she had been working her case plan and simply needed more time to complete her case plan objectives.

{¶ 34} With regard to the custody of her children, Mother testified that she had suggested her maternal aunt as a placement option.   Mother indicated that maternal aunt currently lived alone and that CCDJFS's concerns about her uncle and mother staying at

maternal aunt's residence were no longer an issue. Mother also testified that she would provide maternal aunt with the beds needed for her children. In addition, Mother testified that a second aunt was interested in caring for her children, but she admitted to never having advised CCDJFS of the second aunt's interest in being a placement option.

*The Trial Court's Judgment*

{¶ 35} After considering the testimony and exhibits presented at the permanent custody hearings, the trial court found that Mother was not a credible witness and granted CCDJFS's motions for permanent custody of B.T. and D.T. Mother now appeals from those judgments, raising a single assignment of error for review.

**Assignment of Error**

{¶ 36} Under her assignment of error, Mother contends that the trial court erred by granting CCDJFS permanent custody of B.T. and D.T. Specifically, Mother claims that the evidence presented at the permanent custody hearings established that she had substantially complied with her case plan and that there was a viable kinship placement with her maternal aunt. Upon review, we disagree with Mother's claims.

*General Standards*

{¶ 37} "The United States Supreme Court has stated that parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by this Court.' " *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21

N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The Supreme Court of Ohio has also "long held that parents who are 'suitable' have a 'paramount' right to the custody of their children." *Id.*, quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). (Other citations omitted.) "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' * * * Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991).

{¶ 38} That said, " 'the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App.1974). Therefore, "parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *B.C.* at ¶ 20, citing *Cunningham* at 106.

{¶ 39} "[T]he [trial] court's decision to terminate parental rights will not be overturned if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citation omitted.) *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7. "On review, we give the trial court's final determination 'the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.' " *In re G.B.*, 2d

Dist. Greene No. 2017-CA-30, 2017-Ohio-8759, ¶ 8, quoting *In re Alfrey*, 2d Dist. Clark No. 2001-CA-83, 2003-Ohio-608, ¶ 102. Accordingly, the trial court's decision will not be reversed absent an abuse of discretion. *E.D.* at ¶ 7, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (applying abuse-of-discretion standard to a trial court's findings under R.C. 2151.414).

*R.C. 2151.414*

{¶ 40} R.C. 2151.414 is the statute that governs the termination of parental rights in Ohio. This statute provides a two-part test for courts to apply when determining whether to grant a motion for permanent custody to a public services agency. Specifically, the statute requires the trial court to find by clear and convincing evidence that: (1) any one of the factors enumerated in R.C. 2151.414(B)(1)(a) through (e) exist; and (2) an award of permanent custody to the agency is in the child's best interest. R.C. 2151.414(B)(1). We will now address each of those requirements.

(1) Existence of Factor Under R.C. 2151.414(B)(1)(a) through (e):

{¶ 41} In awarding permanent custody to CCDJFS, the trial court determined that the factor under R.C. 2151.414(B)(1)(b) existed with regard to Father. That factor provides: "The child is abandoned." R.C. 2151.414(B)(1)(b). In this case, it is undisputed that Father abandoned B.T. and D.T., as Father signed a case plan waiver in August 2021 and had not had contact with the children since that time.

{¶ 42} With regard to Mother, the trial court found that the factor under R.C.

2151.414(B)(1)(a) existed. That factor provides: "The child is not abandoned or orphaned, has not been in the temporary custody of one or more public services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." R.C. 2151.414(B)(1)(a).

{¶ 43} When evaluating whether a child cannot be placed with the child's parents within a reasonable time or should not be placed with either parent, the court must consider "all relevant evidence" and determine "by clear convincing evidence" whether one or more of the factors listed under R.C. 2151.414(E)(1) through (E)(16) exist. R.C. 2151.414(E). If there is clear and convincing evidence showing that one or more of the factors under section (E) exist, the trial court must "enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." R.C. 2151.414(E).

{¶ 44} The trial court in this case determined that factor (E)(1) existed by clear and convincing evidence. Factor (E)(1) provides: "[N]otwithstanding reasonable case planning and diligent efforts by the agency to assist the parent to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." R.C. 2151.414(E)(1).

{¶ 45} Here, there is no dispute that CCDJFS developed a case plan for Mother with specific objectives for her to complete so that she could reunify with B.T. and D.T.

There is also no dispute that Mother was aware of the case plan and understood the required objectives. Despite this, and despite Mother's caseworker being very accommodating with meetings and providing Mother with several referrals for counseling, housing, and visitation services, Mother failed to make substantial progress on several of her case plan objectives. Specifically, Mother did not communicate regularly with her caseworker, failed to obtain employment and suitable housing, and did not follow through with mental health counseling. In addition, Mother showed up late to visits with her children and missed several parenting classes.

{¶ 46} Although the record establishes that Mother substantially complied with the objectives to obtain drug and alcohol counseling and to submit to regular drug screens, the results of Mother's drug screens indicate that Mother never stopped using illegal drugs during the pendency of this case. Specifically, Mother tested positive for THC and suboxone on almost every drug screen she participated in, and, on one occasion, cocaine. Furthermore, Mother did not have a medical marijuana card at the time she screened and did not always provide prescriptions for her suboxone use.

{¶ 47} With regard to housing, we note that for most of this case, Mother continued to reside at a home that was the target of multiple shootings. Although Mother testified that she had moved out of that residence on November 5, 2022, (less than two weeks before she testified at the November 16th permanent custody hearing), the record nevertheless established that Mother had not yet obtained stable housing. At the time of her testimony, Mother claimed that she was temporarily living at a friend's house while awaiting improvements to be completed on a two-bedroom apartment for which Mother

did not yet have a lease. Significantly, Mother provided no timeframe for when the apartment would be ready and could not say whether the apartment was located in a safe area.

**{¶ 48}** Upon review, we find that there was clear and convincing evidence in the record establishing that CCDJFS had made diligent efforts to assist Mother in reunifying with B.T. and D.T. and that, despite those efforts, Mother failed to substantially remedy her issues with drug use, housing, employment, and mental health. Accordingly, the trial court's finding that factor (E)(1) of R.C. 2151.414 existed with regard to Mother was not an abuse of discretion. Given that factor (E)(1) applied to Mother, and given that Father had abandoned the children, the trial court's ultimate determination under R.C. 2151.414(B)(1)(a), i.e., that the children could not be placed with either parent within a reasonable time or should not be placed with either parent, was not an abuse of discretion.

(2) Best Interest Determination:

**{¶ 49}** Pursuant to R.C. 2151.414(D)(1), when determining whether an award of permanent custody to a public services agency is in a child's best interest, the trial court is required to consider all relevant factors, including but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through

the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and

(e) Whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

R.C. 2151.414(D)(1)(a)-(e).

{¶ 50} Like the findings under R.C. 2151.414(B) and (E), the trial court's findings under R.C. 2151.414(D)(1) must be supported by clear and convincing evidence. *In re K.W.*, 2d Dist. Clark No. 2013-CA-107, 2014-Ohio-4606, ¶ 7. In this case, the record establishes that the trial court considered all the factors under R.C. 2151.414(D)(1) and determined that it was in B.T. and D.T.'s best interest to grant CCDJFS permanent custody. Based on the following, we find that there was clear and convincing evidence in the record to support that finding.

*(a) B.T. and D.T.'s Interaction and Interrelationship with Parents, Siblings, and Foster Caregivers:*

{¶ 51} B.T. and D.T. were only three years old and 17 months old when they were

removed from Mother's care in 2021. After their removal, Mother was only permitted to have supervised visits with the children. Mother visited the children at the visitation center once a week for three hours. Mother had had issues showing up late to visits, and there were three instances when Mother failed to attend a visit without calling the visitation center. These failures resulted in Mother's visitation being put on hold for a period of time. The children had not had contact with Father since he signed his case plan waiver in August 2021.

**{¶ 52}** At the time of the last permanent custody hearing, B.T. and D.T. had been with their current foster mother for one year. B.T. and D.T.'s placement with foster mother is a foster-to-adopt placement. By all accounts, foster mother was meeting all of the children's needs. B.T. and D.T. were bonded to foster mother and were thriving in her care. Foster mother's grandson lived in the home with B.T. and D.T., and all of the children interacted appropriately with one another. Foster mother facilitated visits with B.T. and D.T.'s half siblings, who had been placed with another caregiver. Foster mother had indicated a willingness to continue those visits so as to maintain a bond between the children.

**{¶ 53}** This factor weighed in favor of granting permanent custody to CCDJFS.


*(b) B.T. and D.T.'s Wishes:*

**{¶ 54}** B.T. and D.T., who were approximately five and three years old at the time of the permanent custody hearings, were not interviewed by the trial court and no testimony was offered purporting to express their wishes. Accordingly, this factor neither

weighed in favor nor against granting permanent custody to CCDJFS.

(c) *Custodial History:*

{¶ 55} B.T. and D.T., who were born in 2017 and 2019, had been in Mother's care until CCDJFS became involved with Mother in early 2021 due to concerns about the conditions of Mother's home and Mother's drug use and mental health. During late March/early April 2021, B.T. and D.T. were initially placed in the care of their maternal grandmother. However, the children were removed from maternal grandmother's care after maternal grandmother tested positive for THC, oxycodone, and cocaine. Thereafter, the children were placed with the O family. After approximately five months, the O Family no longer wanted to serve as B.T. and D.T.'s caretakers due to negative interactions with Mother. As a result, CCDJFS filed a motion for interim temporary custody of the children, which the trial court granted on September 17, 2021. Since that time, B.T. and D.T. had been in the custody of CCDJFS, and the children had been in two different foster placements. At the time of the last permanent custody hearing, the children had been in their current foster placement for a year (since November 2021). When CCDJFS filed its motion for permanent custody, the children had not been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period.

{¶ 56} The foregoing custodial history indicates that B.T. and D.T. had been placed in and out of multiple custody arrangements. Given that the goal was for the children to have permanency and stability, this factor weighed in favor of granting permanent custody

to CCDJFS.

     (d)   *The Children's Need for Legally Secure Placement and Whether Such a Placement Can Be Achieved Without Granting Permanent Custody to CCDJFS:*

{¶ 57} Father had abandoned B.T. and D.T. and Mother had failed to rectify the issues that caused the children to be removed from her care.   Before filing its motion for permanent custody, CCDJFS researched Mother and Father's relatives and attempted kinship placements without success.   As previously discussed, the children were removed from maternal grandmother's care after maternal grandmother tested positive for illegal drugs.   Father's family friends, the O-Family, then took custody of the children until they decided they no longer wanted custody due to negative interactions with Mother. Father's sisters declined to be a placement option as well.

{¶ 58} In this appeal, Mother argues that her maternal aunt was a viable kinship placement option that the trial court overlooked when it granted permanent custody to CCDJFS.   Mother claims that maternal aunt simply needed beds for the children in order to pass CCDJFS's home study and that she (Mother) had offered to provide the beds so that maternal aunt could get custody of the children.   The record, however, established that, in addition to not having beds for the children, maternal aunt was rejected as a kinship placement because she would at times allow Mother's uncle (a registered sex offender) and maternal grandmother (a known drug user) to stay at her residence. CCDJFS also had concerns that maternal aunt lived too close to Mother and would be vulnerable to Mother's persuading her to violate court orders.   Accordingly, we disagree

with Mother's claim that maternal aunt was a viable kinship placement option.

{¶ 59} At the permanent custody hearing, Mother also suggested a second aunt as a kinship placement option, but she admitted that she had never given CCDJFS the aunt's name. Mother also claimed that she had suggested her own father as a kinship placement option. However, CCDJFS had conducted AQUIRANT searches to find relatives and had sent letters to viable relatives with no response. Mother's father and second aunt would have likely shown up during CCDJFS's search, and there was nothing in the record indicating that they were viable placement options or that they had expressed any interest in being a placement option. Accordingly, the record supported the finding that the children were in need of a legally secure placement and that there was no viable kinship placement available.

{¶ 60} This factor weighed in favor of granting permanent custody to CCDJFS.

(e)  *Whether Any of the Factors in R.C. 2151.414(E)(7) Through (11) are Applicable:*

{¶ 61} None of the factors in R.C. 2151.414(E)(7) through (11) were applicable to Mother; therefore this factor neither weighed for nor against granting permanent custody to CCDJFS.

{¶ 62} Based on the foregoing analysis, we find that there was competent, credible evidence from which the trial court could have clearly and convincingly found that the best-interest factors under R.C. 2151.414(D)(1) weighed in favor of granting CCDJFS permanent custody of B.T. and D.T. Accordingly, the trial court did not abuse its discretion by finding that it was in the children's best interest to grant permanent custody

to CCDJFS.

**{¶ 63}** Because the record contains competent, credible evidence satisfying both parts of the two-part test in R.C. 2151.414(B)(1), the trial court did not err when it granted permanent custody to CCDJFS.

**{¶ 64}** Mother's assignment of error is overruled.

## Conclusion

**{¶ 65}** Having overruled Mother's sole assignment of error, the trial court's judgments granting CCDJFS permanent custody of B.T. and D.T. are affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.